UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
——————————————————————————X

DANIEL ZAPATA,

                          Petitioner,

          -against-

BRUCE YELICH,

                          Respondent.
——————————————————————————X

<u>For Online Publication Only</u>

**<u>ORDER</u>**
18-CV-04207 (JMA)

**AZRACK, United States District Judge:**

Petitioner, Daniel Zapata ("Zapata" or "Petitioner"), proceeding <u>pro se</u>, petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 stemming from his conviction for Strangulation in the Second Degree.  (ECF No. 1, the "Petition.")  Zapata pled guilty on May 31, 2016 and on July 27, 2016, was sentenced to a determinate sentence of five years imprisonment to be followed by five years post-release supervision.  (May 31, 2016 Tr. ("May 31 Tr."), ECF No. 12 at 429–30.)[1]  Zapata was released from incarceration on June 30, 2020.[2]  (ECF No. 36.)

In the instant petition, Zapata asserts four grounds for habeas relief.  The crux of Zapata's petition involves claims concerning his unsuccessful motion to withdraw his guilty plea (and related ineffective assistance claims) based on trial counsel's failure to tell Zapata about the existence of an allegedly exculpatory DNA test report before he pled guilty.  For the following reasons, the Petition is **DENIED** in its entirety.

---

[1]  Unless otherwise noted, all documents cited herein are found in the state court record filed by Respondent at ECF No. 12.  Pinpoint citations to "ECF No." refer to the pagination generated by the Court's electronic docketing system and not the document's internal pagination.

[2]  A petitioner under supervised release may be considered "in custody" for the purposes of a habeas petition.  <u>Scanio v. United States</u>, 37 F.3d 858, 860 (2d Cir. 1994).

# I.  BACKGROUND

## A.  Overview

On July 4, 2015, Zapata was arrested in connection with an altercation that took place at the home of KC[3] on the evening of July 3, 2015.  KC alleged that Zapata beat her, struck in the face with a billy club, and strangled her.  Zapata was subsequently charged in a 17-count indictment stemming from this incident.

During jury selection, Zapata pled guilty to Count Three, Strangulation in the Second Degree.  The facts in the record concerning the July 3 incident come from various sources, including the prosecution's representations at Zapata's arraignment, testimony from officers at a pretrial suppression hearing, Zapata's guilty plea allocution, the "PreSentence Investigation Report" ("PIR") prepared by the Probation Department, statements made by KC and Zapata at sentencing, and various court filings by Zapata and the prosecution.

### 1.  The Accounts of KC and the Investigating Officers

KC and Zapata had been in a long-term relationship.  (PIR at 11–13, ECF No. 12 at 35; July 27, 2016 Tr. ("Sent. Tr.") at 4–6.)  Zapata, however, had a heroin problem.  (Id.)  In the months leading up to the July 3 incident, KC and Zapata had separated and police had been called to KC's residence on a number of occasions concerning incidents involving Zapata.  (May 31, 2016 Tr. ("May 31 Tr.") at 2–8.)  During one incident on June 2, 2015, Zapata was told by both KC and the police that he was no longer allowed at her residence.  (May 31 Tr. 4.)

According to KC, on the night of July 3, 2015, Zapata snuck into her house and assaulted her over the course of three hours.  (PIR at 12.)  She told officers that night that he had hit her in the mouth with a billy club she owned, chipping two of her teeth.  (May 17, 2016 Order ("May 17

---

[3]  The Court refers to the alleged victim by her initials.

Order") at 2–3.; May 10, 2016 Tr. ("May 10 Tr.") at 162–64.)  Officers observed that she was crying, frantic, and appeared to be in pain and fearing for her life.  (May 17 Order at 13–14, May 10 Tr. 128.)  They also observed that she had a chipped tooth and was bleeding from her mouth. (Id.)  KC told the officers that Zapata had beat her up, choked her, and did not allow to her leave her house.  (May 17 Order at 1–3; May 10 Tr. 55, 94, 163–64.)  Officers observed bruising on KC's neck and other parts of her body.  (May 17 Order at 1–3; May 10 Tr. 164 (Detective Grathwohl's testimony that her "neck was red in different stages of swelling, bruising"); May 10 Tr. 14, 55, 94, 103, 111; see also May 10 Tr. 36 (testimony of Officer Crosser that there "appeared to be light bruising [on KC's neck]")).  KC recounted to one officer that while she was being choked, she pretended to pass out so that Zapata would leave her alone.  (May 17 Order at 3; May 10 Tr. 164.)

At the scene, police found blood at various spots inside the house and recovered the billy club as well as a knife that had been broken into two pieces.  (May 17 Order at 2; May 10 Tr. 60–61.)  Police also observed and photographed a ladder outside KC's bedroom window, which corroborated her account of Zapata's unauthorized entry into her house.  (May 10 Tr. 159, 162, 166.)

After searching for twenty minutes, officers eventually found Zapata hiding in a large doghouse on KC's property and arrested him.  (May 16 Order at 2.)  Photographs of the scene indicate that bedding was found in the doghouse and suggest that Zapata had brought the bedding into the doghouse and had been sleeping or hiding in the doghouse prior to the incident.  (May 10 Tr. at 100, 155, 156.)  KC maintained that, prior to the July 3 assault, she was not aware that Zapata was living in the doghouse and stalking her from there.  (Sent. Tr. 6; PIR at 11.)

Photos were apparently taken of KC's injuries, and she was taken to the hospital where she

3

underwent multiple tests.[4]  (Sent. Tr. 5 ("You saw the photos"); PIR at 12.)

KC has also maintained that, during the assault, Zapata: (1) urinated in her mouth twice; (2) kept throwing her in the shower to wake her up and continue hitting her; (3) broke her finger trying to get her ring off; and (4) kept telling her that he had to kill her because it "went too far." (PIR at 11–12; Sent. Tr. 5–7; July 16, 2015 Tr. ("Arraignment Tr.") at 4–5, ECF No. 28-1.)  KC has also explained how she tried to get Zapata in rehab for his heroin addiction and that he was angry at her for calling his family to try to get him help for his addition.  (Sent. Tr.  4–6; PIR at 11.)

At the pretrial hearing, officers testified that certain aspects of KC's account were not relayed to them that night.  (See May 10 Tr. 96–97; see also id. at 110 (KC did not tell Officer Jernick that Zapata had tried to rape her); May 10 Tr. 165 (KC did not tell Detective Grathwohl him that Zapata had tried to rape her)).  Certain other aspects of KC's account were not mentioned (or inquired into at all) during the testimony at the pretrial hearing, including Zapata's alleged urination in her mouth and the multiple instances where he threw her into the shower.

### 2.  Zapata's Account of the July 3 Incident

Zapata has provided—in statements to officers, at sentencing, and in court filings—various accounts of the incident.

After his arrest, Detective Grathwohl took a statement from Zapata at police headquarters. After speaking with Detective Grathwohl, Zapata signed a written statement memorializing what he had told him.[5]  (May 10 Tr. 132.)  Zapata told Detective Grathwohl that he and KC had an off-

---

[4]  While the state court record provided to this Court does not include copies of these photos, Zapata's filings in state and federal court never address these photos and the record suggests that the photos taken of KC corroborate her account.

[5]  This written statement was referenced at the pretrial hearing and was relied on by the trial court in ruling on those motions.  Zapata's written statement, however, is not included in the state court record provided to this Court.

and-on relationship for over twenty years and that, after a recent breakup, they had just gotten back together again a few days before the July 3 incident.  (May 10 Tr. 131, 139.)  Zapata maintained that he was sleeping in her house on the evening of July 3 when she woke him up by hitting him with a bottle.  (May 17 Order at 3; May 10 Tr. 131, 140, 170.)  Zapata claimed that, in response to KC hitting him, he threw his cell phone at her, which struck her in the face.  (May 17 Order at 3; May 10 Tr. 139.)  Zapata admitted that, after he threw the phone at KC, they continued to fight until KC told him that she would take him home.  (May 17 Order at 3.)  When they got outside, KC started screaming at him and she told him to sleep in the doghouse.  (Id.)

Zapata told another officer on the scene that KC threw the billy club at him and that, in response he threw his phone at her, striking her in the face.  (May 10 Tr. 80.)

According to Zapata, KC started the fight on July 3 because KC had looked on his phone and saw that he was texting another woman.  (May 17 Order at 3; May 10 Tr. 139.)  While Zapata has asserted that these text messages would corroborate his version of events, he has never submitted to the state court or this Court, any evidence concerning these text messages.

At sentencing, Zapata asserted—in connection with an attempt to withdraw his guilty plea—that: (1) he did not beat KC; (2) he did not break into the house, had been there all day, and was sleeping when KC started the fight by hitting him with the billy club; and (3) text messages and a phone call involving a woman named "Tammy" would corroborate his account.  (Sent. Tr. 15–17.)  At sentencing, Zapata also admitted that he quickly choked KC, but insisted that this did not rise to the level of strangulation.  (Sent. Tr. 17.)

**B.  Procedural History Culminating in Zapata's Guilty Plea**

Zapata was charged with six felonies:

- Count One:  Attempted Murder in the Second Degree (N.Y. Penal Law § 110/125.25(1)), a "B" felony;

- Count Two:  Attempted Rape in the First Degree (N.Y. Penal Law § 110/130.35(1)), a "C" felony;

- Count Three:   Strangulation in the Second Degree (N.Y. Penal Law § 121.12), a "D" felony;

- Count Four:  Assault in the Second Degree (N.Y. Penal Law § 120.05(2)), a "D" felony;

- Count Five:  Criminal Possession of a Weapon in the Third Degree (N.Y. Penal Law § 265.02(1)), a "D" felony; and

- Count Six:  Unlawful Imprisonment in the First Degree (N.Y. Penal Law § 135.10), an "E" felony;

(Indictment at 1–8.)

Zapata was also charged with three violations and eight misdemeanors, ranging from unlawful imprisonment in the fourth degree, assault in the third degree, and criminal obstruction of breathing.  (Id.)  The indictment explicitly tied Counts Four, Five, and Eight (a misdemeanor criminal possession of a weapon charge) to Zapata's alleged use and possession of the billy club during the incident.  (Id.)

Prior to trial, Zapata's counsel, Richard Stafford, and the prosecution had engaged in plea negotiations, which included an offer by Zapata to plead to Attempted Assault with an indeterminate sentence of one-and-a-half to three years, along with a condition concerning the "Willard program."  (May 10 Tr. 74–75.)  The prosecution, however, did not accept that offer and Zapata rejected the prosecution's plea offer—Assault in the Second Degree, which would have resulted in a three-year minimum sentence.  (Id. at 74–75.)

A few weeks before trial, the presiding judge, the Honorable Timothy P. Mazzei, held a hearing to address certain pretrial motions.  At the hearing, three investigating officers testified.  (May 17 Order at 1–3; May 10 Tr.)  Stafford's questioning at the pre-trial hearing was skillful and indicates that he was prepared and well-versed in the facts of the case.  (May 10 Tr.)  After the hearing, Judge Mazzei issued a decision crediting the officers' testimony and ruling against Zapata on the pretrial motions.  (May 17 Order at 1–3.)

On May 24, 2016—a week before the trial was set to begin—the Suffolk County Crime Laboratory issued a report concerning a DNA analysis it had conducted of the billy club and the knife (the "DNA Report").  (DNA Report, ECF No. 12 at 18–19.)  The DNA Report found that 12 of 16 loci on the handle of the billy club matched KC's DNA profile.  (Id.)  Testing of the billy club shaft, however, returned "[i]nconclusive DNA results" that were "not suitable for comparison purposes due to the poor quality or complexity of the data."  (Id.)  No human DNA was found on the knife.  (Id.)  The prosecution sent a copy of the DNA Report to Stafford on May 24, 2016, the same day the report was issued.  (DNA Report, ECF No. 12 at 18–19; Fax Transmission, ECF No. 12 at 21–22.)

As explained further infra, Zapata maintains that Stafford did not tell him about the DNA Report until after his guilty plea.

The trial started on May 31, 2016.  Before jury selection began, Judge Mazzei ruled against

Zapata on additional evidentiary issues.[6]  (May 31 Tr. 3–9.)  Then, in the middle of jury selection

on May 31, 2016, Zapata pled guilty to Count Three, Strangulation in the Second Degree.  (Id. at

58–72.)  As part of the plea deal, the prosecution agreed to recommend a determinate three-year

sentence (with five years of supervised release) conditioned on Zapata's cooperation with the

Probation Department.  (Id. at 59–60, 66.)  Zapata admitted his guilt through the following

allocution:

> [Assistant District Attorney] MR. SANTOMARTINO:  I'd like to direct your
> attention to July 3, 2015 in the evening hours. On that date, at that time were you
> located at [KC's] house . . .?
>
> THE DEFENDANT:  Voluntarily, yes.
>
> MR. SANTOMARTINO:  And on that date, time and location did you apply
> pressure on the throat or neck of [KC]?
>
> THE DEFENDANT:  Yes.

_____

[6] Judge Mazzei's rulings permitted the prosecution to introduce evidence concerning prior interactions between
Zapata and KC, including:

- a January 28, 2015 incident in which Zapata damaged KC's windshield after they had an argument, (May 31
  Tr. 3);

- a March 4, 2015 incident where police were called and Zapata told an officer that he was going to leave the
  residence and move somewhere else, and even signed a statement to that effect, (Id. at 3–4; May 10 Tr. 56);

- a June 2, 2015 incident in which KC called the police after Zapata appeared at her home, repeatedly banged
  on the windows and doors, and was eventually told by both the police and KC that he was no longer allowed
  at KC's residence, (May 31 Tr. 4); and

- a June 29, 2015 incident where, although the police were not called, Zapata appeared at KC's home, acted
  aggressively, cursed at KC and a male friend, and asked if KC and this man were in a sexual relationship,
  (id.).

Judge Mazzei also allowed the prosecution to introduce two phones calls that Zapata made from jail after the
July 3 incident.  (Id.)  In a July 4 telephone call to KC, he asked her to give him another chance, and apologized for
his actions.  (Id.)  He also called KC on July 13, 2015 in violation of a then-pending order of protection.  (Id.)  During
this call, Zapata again stated that he was "sorry."  (Id. at 4–5)

The prosecution also sought to introduce a July 4, 2015 letter Zapata sent to KC in which he stated that he
needs help and did not remember anything except KC giving him Xanax to help with his heroin withdrawal.  (Id. at
6.)  Judge Mazzei did not allow the prosecution to introduce this letter as part of its direct case, but permitted it to be
used on cross-examination in the event Zapata testified.  (Id. at 9.)  Finally, in addressing an application by the
prosecution concerning Zapata's prior convictions, Judge Mazzei allowed the prosecution to ask Zapata if he had been
convicted of more than one felony in the event he testified at trial.  (Id. at 9)

MR. SANTOMARTINO:  And did you do so with the intent to impede the normal breathing or circulation of the blood of [KC]?

THE DEFENDANT:  I didn't mean to, but yes. (Whereupon, counsel confers with the defendant.)

THE DEFENDANT: Yes.

MR. SANTOMARTINO: Did you do so with the intent to impede her normal breathing or blood circulation?

THE DEFENDANT:  Yes.

MR. SANTOMARTINO:  And did you do so - as a result of your actions, did you cause stupor, lass of consciousness or physical injury or substantial pain to [KC]?

MR. STAFFORD:  Or impairment?

MR. SANTOMARTINO:  Or impairment to [KC]?

THE DEFENDANT:  Yes

(Id. at 69–70.)  During the plea colloquy, Zapata affirmed that he had discussed the plea with his attorney, had sufficient time for such discussions, and was satisfied with the representation provided by his attorney.  (Id. at 62–64.)  Judge Mazzei explained the rights Zapata was waiving in pleading guilty, such as his right to a trial by jury and a right to appeal, and Petitioner confirmed that he understood.  (Id.)  Further, Judge Mazzei informed Zapata multiple times that no promise was being given to him regarding sentencing, that the court could impose a longer sentence than recommended by the prosecution, and Zapata could not withdraw his plea if he was dissatisfied with his sentence.  (See, e.g., id. at 66–68.)  Zapata acknowledged, approximately ten times, that he understood that no promise was made regarding the sentence he would receive approximately ten times.  (Id. at 60–61, 65–67.)

After pleading guilty, Zapata declined to be interviewed by the Probation Department and informed them that he intended to withdraw his plea.  (PIR at 11–12.)  He told the Probation

9

Department that he "can't take the strangulation [charge]" because he did not "strangle" KC as it was only a "brief obstruction."  (Id.)

At his sentencing hearing on July 27, 2016, Zapata sought to withdraw his plea.  Stafford made an oral motion to withdraw the plea, stating that "[Zapata] has informed me that he did not understand this plea at the time he took it, he asserts his innocence, and he would like his plea back to go to trial."  (Sent. Tr. 2.)  Judge Mazzei denied that request, explaining that:

> I have a pretty good recollection of the plea, which was painstakingly taken, . . . [t]o make sure that Mr. Zapata understood exactly what he was doing.  . . . I find Mr. Zapata to be an intelligent individual who, again, understood exactly what he wanted to do, and he did it.

(Id. at 3.)

KC then addressed the court, recounting the details of the assault and describing its impact on her life.  (Sent Tr. 4–8.)  The prosecution then weighed in, arguing that Zapata should receive the maximum sentence for his conviction, which was seven years.  (Sent Tr. 8–10; Aff. in Opp. to Coram Nobis Petition ¶ 14, ECF No. 12 at 153.)  The prosecution contended that the maximum sentence—rather than the three-year sentencing recommendation that was originally agreed to—was warranted because, contrary to the plea agreement, Zapata failed to cooperate with the Probation department, maintained his innocence, and minimized his conduct in his probation interview.  (Sent Tr. 8–10.)

When Zapata was given the opportunity to address the court, he provided a rambling statement, arguing that he should be permitted to withdraw his guilty plea.  (Id. at 11–19.)  He maintained that he was under "duress and confusion" when he pled guilty and had not taken his medication (without identifying what that medication was).  (Id. at 11.)  Additionally, Zapata

claimed that he only learned that "the DNA evidence was in [his] favor" after the plea.[7]   (Id.)
Zapata also asserted that:

- the DNA evidence proved that he never held the billy club and he was instead the victim";

- he was "innocent of the top seven charges";

- given the DNA evidence, the prosecution "had the ethical responsibility to dismiss the top seven counts in furtherance of justice";

- based on the DNA evidence, he wanted to withdraw his plea so that he could file motions to dismiss the indictment;

- Stafford conspired with the District Attorney to have him take the plea; and

- the crime scene at KC's house was "staged."

(Id. at 11–18.)  During his statement, Zapata also made the following inculpatory admission:

> [I]t is wrong what I did.   All I did was choke her, yes, quick choke.   No strangulation.   No petechial hemorrhage, no black and blues to prove strangulation. If the court would give me a trial, I could prove this.

(Id.)

Zapata also referenced earlier plea discussions, stating he had been willing—and suggesting that he was still willing—to plead guilty to "an E felony, on the assault" and accept a "consecutive sentence" for that conviction.  (Id. at 16.)  Zapata proceeded to add that "if anything, I'm guilty of the last ten charges, which are misdemeanors."  (Id.)

In response to Zapata's assertions about the DNA evidence, the prosecutor told Judge

---

[7]  At sentencing, Zapata did not explain how or when learned about the DNA Report.  In his Second § 440.10 motion, which is discussed infra, Zapata claims that on May 31—immediately after he pled guilty—Stafford whispered in his ear that the DNA evidence came back and indicated that Zapata did not possess the billy club.  (June 21, 2018 Ltr., ECF No. 18-1 at 26.)  Zapata's account of this conversation is contained in a letter he allegedly sent to Stafford in June 2018.  (Id.)  Zapata, however, has not provided any affidavit attesting to this account of what allegedly transpired on May 31.  Moreover, even assuming that Zapata's account of this conversation is correct, there are other notable gaps in the record.  Zapata does not explain what he and Stafford discussed about his case prior to the guilty plea, including what advice Stafford provided him connection with his guilty plea.

Mazzei that he had provided all the laboratory reports to defense counsel prior to jury selection and asked Stafford to acknowledge receipt of the reports.  (Sent. Tr. 19.)  Stafford then asked to withdraw as counsel in light of Zapata's assertion that Stafford conspired with the prosecutor to force him to take a plea.  (Id.)  Stafford did not address the prosecutor's statement that the prosecution had sent him the laboratory reports prior to jury selection.  (Id.)

The DNA Report itself was not introduced at the sentencing hearing.

Before sentencing Zapata, Judge Mazzei denied Stafford's request to withdraw and reaffirmed his denial of Zapata's motion to withdraw his guilty plea.  (Id. at 19–21.) Judge Mazzei then sentenced Zapata to five years imprisonment with five years of post-release supervision.  (Id.)

## B. Procedural History

### 1. Direct Appeal

Zapata appealed his conviction and sentence to the New York Appellate Division, Second Department (the "Appellate Division").  For his direct appeal, he was represented by new appellate counsel, Del Atwell.  In his direct appeal, Zapata raised three arguments: (1) Judge Mazzei should have granted his motion to withdraw; (2) Judge Mazzei's suppression rulings were erroneous; and (3) Zapata's sentence, which exceeded the sentence initially recommended by the prosecution, was excessive, an abuse of the court's discretion, and should be reduced.  (Appellant's Br., ECF No. 12 at 37–59.)  In addressing the motion to withdraw his guilty plea, Zapata's brief states that he "asked to withdraw his plea before sentencing because he learned that this particular judge, who is new to the bench, had quickly earned a reputation for disregarding the prosecutor's sentencing recommendations and negotiated plea bargains" and Zapata "did not know this at the moment of the plea."  (Appellant's Br. at 14.)  Zapata argued that Judge Mazzei's denial of the motion to withdraw constituted an erosion of trust in the plea bargaining process.  (Id. at 48–54.)  Zapata's

brief stressed that Judge Mazzei departed from the "ordinary" practice in state court that permits a defendant to withdraw his plea if the judge decides not to abide by an agreed-upon sentence.  (Id. at 52.)  Zapata's appellate brief contains only a single passing reference to the DNA evidence, which is the crux of his federal habeas petition.  (Id. at 53.)  Zapata did not raise an ineffective assistance of counsel claim in his direct appeal.

On February 21, 2018, the Appellate Division rejected all three claims and affirmed Zapata's conviction and sentence.  People v. Zapata, 158 A.D.3d 778, 68 N.Y.S.3d 757 (2d Dep't 2018).  As to Zapata's challenge concerning his motion to withdraw the plea, the Appellate Division determined that Zapata's "unsubstantiated and conclusory allegations are belied by the record and insufficient to warrant vacatur of [his] plea of guilty."  (Id.)  For Zapata's sentencing claims, the Appellate Division found that although Zapata's appeal waiver did not bar these claims because he received an enhanced sentence, his sentencing challenges failed on the merits.  (Id.)

Zapata subsequently sought leave to appeal to the New York Court of Appeals, which was denied on May 9, 2018.  People v. Zapata, 31 N.Y.3d 1090 (2018).

**2. First Motion to Vacate Judgment**

On February 8, 2018—while his appeal before the Appellate Division was still pending—Zapata filed a pro se Motion to Vacate Judgment pursuant to C.P.L. § 440.10(3).  Zapata asserted, inter alia, that:  (1) his due process rights were violated because he was not given the DNA evidence until after he pled guilty and the prosecutor failed to protect his constitutional rights; (2) in light of the DNA evidence he should have been allowed to withdraw his plea and a hearing should have been held on his motion to withdraw.  (First 440.10 Mot., ECF No. 12 at 110–113; Mar 20, 2018 Order.)  This § 440.10 motion did not raise an ineffective assistance of counsel claim.

In response to Zapata's motion, the District Attorney provided Judge Mazzei and Zapata with a copy of the DNA Report along with proof that the report was sent to Stafford on May 24, 2016.  (DNA Report; Fax Transmission; Affidavit of Service, ECF No. 12 at 20; Aff. in Opp. to First § 440.10 Motion ¶¶ 24–25.)  This appears to have been the first time that a copy of the DNA Report was provided to Judge Mazzei.

 On March 20, 2018—after the Appellate Division had denied Zapata's direct appeal—Judge Mazzei denied Zapata's § 440.10 motion as both procedurally barred and meritless.  (March 20, 2018 Order.)  Zapata did not appeal this decision.

Zapata claims that he was unable to appeal because he was in the Special Housing Unit ("SHU") when Judge Mazzei issued this order and he was unable to obtain the necessary motions and documents to file an appeal.  (Petition at 5.)  Zapata's Petition, however, does not identify exactly when he entered the SHU or when he was released.  In one filing, Zapata asserts that his placement in the SHU was later overturned.  (ECF No. 29.)

Nothing in the record indicates that, after leaving the SHU, Zapata sought permission from the Appellate Division to file a late application for leave to appeal.

### 3. Writ of Error Coram Nobis

On March 17, 2018, Zapata filed a pro se petition for writ of error coram nobis in the Appellate Division, alleging that his appointed appellate counsel provided ineffective assistance because he failed to argue, on direct appeal, that trial counsel was ineffective for failing to tell Zapata about the DNA Report prior to his guilty plea.  (Petition for Writ of Error Coram Nobis, Mar. 17, 2018, ECF No. 12 at 130-144; Aff. in Reply, ECF No. 166–180.)  In response to this petition, Atwell submitted an affirmation stating that he determined that the various arguments Zapata asked him to include in his direct appeal—which included this ineffective assistance of

14

counsel claim—were frivolous.  (Aff. of Del Atwell ¶¶ 3–4, ECF No. 12 at 145–46.)

On October 3, 2018, the Appellate Division denied this petition, finding that Zapata had "failed to establish that he was denied the effective assistance of appellate counsel."  People v. Zapata, 165 A.D.3d 712, 82 N.Y.S.3d 737 (2d Dep't 2018).

Zapata requested leave to appeal this decision to the Court of Appeals, which was denied on February 27, 2019.  People v. Zapata, 32 N.Y.3d 1211 (2019).

**4. The Instant § 22554 Petition**

Zapata filed the instant § 2254 Petition on June 26, 2018.  (See Pet.)  The Petition raises four grounds for relief:  (1) Judge Mazzei was required to hold a hearing on the motion to withdraw the plea; (2) Stafford provided ineffective assistance in connection with the DNA Report; (3) Zapata's sentence was unlawfully enhanced sentence due to the KC's statement at sentencing; and (4) his right to a speedy trial was violated.  (Id.)

After Respondent argued that Zapata had failed to exhaust all the claims raised in the Petition, Zapata requested, in  November 2018, a stay to allow him to exhaust his claims in state court.  (Stay Request, ECF No. 14.)  The Honorable Joseph F. Bianco granted that request.[8]  (Dec. 12, 2018 Order, ECF No. 15.)  As noted above, Zapata subsequently exhausted the ineffective assistance of counsel claim raised in his coram nobis petition.

**5. Second Motion to Vacate**

As part of his efforts to exhaust the claims raised in his Petition, Zapata filed a second Motion to Vacate Judgment pursuant to C.P.L. § 440.10 on or about November 2, 2018.  (Second § 440.10 Motion, ECF No. 18-1.)  His second § 440.10 motion raised two related claims concerning the DNA Report.  One, Zapata claimed that trial counsel was ineffective for failing to

---

[8] Judge Bianco presided over the instant Petition until it was transferred to the undersigned on May 16, 2019.

disclose the DNA Report to him prior to his guilty plea.  (Id.)  Two, Zapata alleged that because he was unaware of the DNA Report when he pled guilty, it constituted newly discovered evidence and was a basis to vacate his plea.  (Id.)

On December 10, 2018, Judge Mazzei found both claims procedurally barred and, in any event, meritless.  (Dec. 10, 2018 Order, ECF No. 18-3.)  With regard to Zapata's argument that trial counsel was ineffective, Judge Mazzei found, pursuant to C.P.L. § 440.10(3)(c), that Zapata's failure to raise this claim in his previous 440.10 motion precluded him from raising it now, pursuant to C.P.L. § 440.10(3)(c).  (Id.)  Judge Mazzei also found that this claim was meritless because Zapata "zealously represented him at all times," and the DNA Report is "not exculpatory." (Id.)  With respect to Zapata's second argument—namely, that his conviction should be vacated because he did learn about the DNA Report until after he pled guilty—Judge Mazzei found this claim was procedurally barred because:  (1) Zapata failed to raise the claim on direct appeal, see C.P.L. § 440.10(2)(c); and (2) this same claim had already been rejected by Judge Mazzei in Zapata's first 440.10 motion, see C.P.L. § 440.10(3)(b).

Zapata did not seek leave to appeal Judge Mazzei's December 10, 2018 order to the Appellate Division. (Jan. 22, 2019 Ltr., ECF No. 18.)  In a January 9, 2019 letter to Judge Bianco, Zapata asserted that he was unable to timely appeal Judge Mazzei's denial of his second § 440.10 motion by the January 13, 2019 deadline to appeal.  (Jan. 9, 2019 Ltr, ECF No. 16.)  Zapata explained that when he was transferred to a new facility, his legal materials were either "purposely thrown away" by corrections officers, "lost in transit," or "misplaced."  (Id.)  According to Zapata's submissions, his legal materials were lost around December 19, 2018—ten days after Judge Mazzei issued his decision denying Zapata's second § 440.10 motion. (Id.)  In his January 9, 2019 letter to Judge Bianco, Zapata requested copies of his missing papers.  (Id.)  On January

16, 2019, Judge Bianco ordered Respondent to send Zapata a "copy of all materials related to [his] most recent N.Y. C.P.L. § 440.10 motion." (Jan. 16 Order, ECF No. 17.) In a March 6, 2019 letter to Judge Bianco, Zapata confirmed that he had received all the materials he had requested. (Mar. 6, 2019 Ltr., ECF No. 24.)

After receiving these materials, Zapata never sought permission from the Appellate Division to file a late application for leave to appeal. (See Mar. 11, 2019 Ltr., ECF No. 25.)

## II. DISCUSSION

### A.  Standards of Review

#### 1.  Overview of AEDPA

Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214 (1996), to restrict the "power of federal courts to grant writs of habeas corpus to state prisoners." Williams v. Taylor, 529 U.S. 362, 399 (2000) (O'Connor, J., concurring). Under AEDPA, a district court will "entertain an application for a writ of habeas corpus [on] behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). To make that showing, the petitioner must satisfy three hurdles: (1) the exhaustion of state court remedies, (2) the absence of a procedural bar, and (3) the satisfaction of AEDPA's deferential review of a state court decision. See 28 U.S.C. § 2254.

#### 2.  Exhaustion

A court cannot review a habeas petition unless a petitioner "has exhausted the remedies available" in state courts. 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement is designed to provide state courts with the "'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" Jackson v. Edwards, 404 F.3d 612, 619 (2d Cir. 2005) (quoting Picard

17

v. Connor, 404 U.S. 270, 275 (1971)).  Therefore, a petitioner must show that he fairly presented his federal claim to the "highest state court capable of reviewing" that claim.  Jackson v. Conway, 763 F.3d 115, 151 (2d Cir. 2014) (quoting Rosa v. McCray, 396 F.3d 210, 217 (2d Cir. 2005)); see also Daye v. Att'y Gen. of N.Y., 696 F.2d 186, 190 n.3 (2d Cir. 1982) (en banc).  Although the petitioner need not "'cite chapter and verse of the Constitution in order to satisfy this requirement,' he must tender his claim 'in terms that are likely to alert the state courts to the claim's federal nature.'"  Jackson, 763 F.3d at 133 (quoting Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011)).

However, AEDPA recognizes that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(2).  This is appropriate where the claim is "plainly meritless" or "patently frivolous."  See Williams v. Artus, 691 F.Supp.2d 515, 526 (S.D.N.Y.2010) ("If the unexhausted claims are 'plainly meritless,' the district court can dismiss these claims on the merits.") (citation omitted); Warren v. Goord, No. 06-CV-1423, 2013 WL 1310465, at *11 (E.D.N.Y. Mar. 28, 2013) (collecting cases where courts in this Circuit denied unexhausted claims "upon a determination that they are patently frivolous") (citations omitted).

Additionally, federal courts may deem unexhausted claims to be exhausted, but procedurally barred where the state court to which the petitioner must present those claims would find them procedurally barred.  See Jackson, 763 F.3d at 143–44.  In those circumstances, the claims are deemed exhausted, but procedurally defaulted.  See Clark v. Perez, 510 F.3d 382, 390 (2d Cir. 2008) (citing Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991)); Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001); Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997).  The federal court may then only address the merits of the procedurally defaulted claim if the petitioner can

overcome the procedural bar in one of the ways described below.

### 3. Procedural Default

A federal court will not review a habeas petition "when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, 556 U.S. 449, 465 (2009) (quoting Coleman, 501 U.S. at 729). For this reason, under the doctrine of procedural default, a federal court will not review "the merits of claims, including constitutional claims, that a state court declined to hear because the [petitioner] failed to abide by a state procedural rule." Martinez v. Ryan, 566 U.S. 1, 9 (2012). When a state court has dismissed a claim on such a procedural ground, the petitioner is procedurally barred from raising that claim in a § 2254 petition unless the petitioner can meet certain exceptions explained below.

The procedural bar applies if the state court decided a claim on such procedural grounds, even if the state court addressed the merits of a claim in the alternative. Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990) (per curiam); see also Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) (observing that "a state court need not fear reaching the merits of a federal claim in an alternative holding" where the court explicitly invokes a procedural rule as an independent ground for its decision) (emphasis in original).

Additionally, as explained earlier, a procedural bar also applies "where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" Reyes, 118 F.3d at 140 (quoting Coleman, 501 U.S. at 735) (emphasis omitted).

A petitioner may overcome a procedural bar by demonstrating either (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law" or (2) "that failure

19

to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750. To demonstrate cause, a petitioner must establish that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule": for example, that the factual or legal basis for a claim was not reasonably available to counsel or that some interference by officials . . . made compliance impracticable." Murray v. Carrier, 477 U.S. 478, 488 (1986) (internal quotation marks and citations omitted). A petitioner may also satisfy the cause requirement by demonstrating that the failure of his attorney to comply with state procedural rules denied him constitutionally adequate representation. See Tavarez v. Larkin, 814 F.3d 644, 650 (2d Cir. 2016), cert. denied, 137 S. Ct. 106 (2016); see also Restrepa v. Kelly, 178 F.3d 634, 640 (2d Cir. 1999). A petitioner, however, generally cannot invoke this ground unless he first asserted an equivalent independent Sixth Amendment ineffective assistance claim in state court and exhausted his state-court remedies with respect to that claim. See, e.g., Edwards v. Carpenter, 529 U.S. 446, 451–52 (2000).

As for the prejudice requirement, the petitioner must demonstrate that counsel's errors (or any other basis invoked by the petitioner to establish cause) not only "created a possibility of prejudice, but that they worked to his actual and substantial disadvantage. . . ." United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original).

Even if a petitioner cannot establish cause and prejudice, a federal court may also excuse a petitioner's procedural default if he can show that a fundamental miscarriage of justice would result; in other words, "that he is actually innocent of the crime for which he has been convicted." Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) (citing Schlup v. Delo, 513 U.S. 298, 321 (1995)). To prevail, the petitioner must put forth "new reliable evidence . . . that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of

actual innocence are rarely successful."  Schlup, 513 U.S. at 324.

**4.  AEDPA Standard of Review**

If a state court reached the merits of a claim, a federal court may not grant a writ of habeas

corpus unless the state court's adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.SC. § 2254(d).  The Supreme Court has construed AEDPA "to give independent meaning to

'contrary [to]' and 'unreasonable.'"  Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000).

A state court's decision is "contrary to" clearly established federal law if "the state court

arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if

the state court decides a case differently than [the Supreme Court] has on a set of materially

indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 412–13 (2000) (O'Connor, J.,

concurring).  A decision involves "an unreasonable application" of clearly established federal law

when a state court "identifies the correct governing legal principle from [the Supreme Court's]

decisions but unreasonably applies that principle to the facts of [a] prisoner's case."  Id. at 413.

This standard does not require that all reasonable jurists agree that the state court was wrong.  Id.

at 409–10.  Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to

all reasonable jurists.'"  Jones, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109

(2d Cir. 2000)).

AEDPA "'imposes a highly deferential standard for evaluating state-court rulings and

demands that state-court decisions be given the benefit of the doubt.'"  Jones v. Murphy, 694

21

F.3d 225, 234 (2d Cir. 2012) (quoting <u>Hardy v. Cross</u>, 565 U.S. 65, 66 (2011) (per curiam)).  This standard is "difficult to meet," and for good reason.  <u>White v. Woodall</u>, 572 U.S. 415, 419 (2014) (quoting <u>Metrish v. Lancaster</u>, 569 U.S. 351, 357–58 (2013)), <u>reh'g denied</u>, 573 U.S. 927 (2014). A petitioner must show that the "state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  <u>Id.</u> at 419–20.

Furthermore, a state court's determinations of factual issues are "presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); <u>see also</u> <u>Lynn v. Bliden</u>, 443 F.3d 238, 246 (2d Cir. 2006).   A state court's findings of fact will be upheld "unless objectively unreasonable in light of the evidence presented in the state court proceeding."  <u>Lynn</u>, 443 F.3d at 246–47 (quoting <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003)).  Thus, a federal court may overrule a state court's judgment only if "after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated."  <u>Williams,</u> 529 U.S. at 389.

### 5. Petitioner's <u>Pro Se</u> Status

Petitioner "bears the burden of proving by a preponderance of the evidence that his constitutional rights have been violated."   <u>Jones v. Vacco</u>, 126 F.3d 408, 415 (2d Cir. 1997).   In light of Petitioner's <u>pro se</u> status, the Court will construe his submissions liberally and interprets them "to raise the strongest arguments that they suggest."  <u>Kirkland v. Cablevision Sys.</u>, 760 F.3d 223, 224 (2d Cir. 2014) (per curiam) (quoting <u>Burgos v. Hopkins</u>, 14 F.3d 787, 790 (2d Cir. 1994)). However, a <u>pro se</u> petitioner is not excused "from compliance with relevant rules of procedural and substantive law."  <u>Traguth v. Zuck</u>, 710 F.2d 90, 95 (2d Cir. 1983) (cleaned up).

**B.  Grounds One and Two Concerning the Motion to Withdraw the Plea and Ineffective Assistance of Counsel**

### 1.  Overview

The first two grounds in Zapata's § 2254 Petition concern the DNA Report that Zapata maintains he only learned about after he pled guilty.

Zapata first contends that, given his ignorance of the DNA Report at the time of his plea due to Stafford's withholding of this evidence, Judge Mazzei should have granted him a hearing on his motion to withdraw.  Zapata insists that if he had been aware of the DNA Report, he would not have pled guilty.  Zapata also appears to assert that his motion to withdraw should have been granted.

Zapata also advances related ineffective assistance claims concerning the DNA Report. Construing the claims in the Petition liberally, he asserts that Stafford was ineffective for:  (1) not telling him about the DNA Report prior to the guilty plea; and (2) not filing a motion to withdraw the plea based on the DNA Report.  Zapata also appears to assert that appellate counsel was ineffective for not raising, on direct appeal, a claim that Stafford provided ineffective assistance in connection with the DNA Report.

As explained below, at least some of these claims have been procedurally defaulted.  They are also all substantively meritless and fail on various grounds, some of which are particular to the specific claim at issue.  However, the primary defect common to all these claims is that the DNA Report is not the compelling exculpatory evidence Zapata believes it to be.  Thus, before addressing the specifics of each of Zapata's legal claims related to the DNA Report it is helpful to first address the factual bases and erroneous assumptions underlying those legal claims, including Zapata's allegations that:  (1) the DNA Report was exculpatory; (2) given the DNA Report, he would have obtained outright dismissal of the indictment; and (3) had known about the DNA

Report prior to pleading guilty he would proceeded to trial.

**2. Zapata's Factual Claims about the Allegedly Exculpatory DNA Report**

Zapata insists that, using the DNA Report, he would have pursued motions to dismiss the indictment pursuant to N.Y. Crim. Proc. Law § 210.35 and that these motions would have succeeded because, according to Zapata, the DNA Report definitively proves that he never used the billy club and that KC lied in the grand jury.[9]  (ECF No. 18-1 at 10–14.)  This argument is meritless.[10]  The DNA Report would not have resulted in the outright dismissal of any of the counts and certainly not dismissal of the Strangulation count for which Zapata pled guilty.

Most importantly, the Strangulation count did not even involve Zapata's alleged use of the billy club.  As such, the DNA Report was not exculpatory as to the Strangulation count.

At most, the DNA Report could have been used by Zapata <u>at trial</u> to try to:  (1) counter KC's account that he attacked her with the billy club; and (2) to impeach KC's broader credibility and account of the other events that night, including the strangulation.  However, this would have required Zapata to go to trial on all 17 counts in the indictment, including the felony charges for

---

[9]  New York C.P.L § 210.35, entitled "Motion to dismiss indictment; defective grand jury proceeding," states:

> A grand jury proceeding is defective within the meaning of paragraph (c) of subdivision one of section 210.20 when:
>
>  1. The grand jury was illegally constituted; or
>
>  2. The proceeding is conducted before fewer than sixteen grand jurors; or
>
>  3. Fewer than twelve grand jurors concur in the finding of the indictment; or
>
>  4. The defendant is not accorded an opportunity to appear and testify before the grand jury in accordance with the provisions of section 190.50; or
>
>  5. The proceeding otherwise fails to conform to the requirements of article one hundred ninety to such degree that the integrity thereof is impaired and prejudice to the defendant may result.

[10]  Zapata also asserts that the DNA Report gave him grounds to file a motion a suppress the billy club, which Zapata claims would have also resulted in the dismissal of the indictment.  (ECF No. 18-1 at 9.)  This argument is similarly meritless.

Strangulation, Unlawful Imprisonment, and Attempted Rape.

Moreover, even as to KC's specific claims that Zapata hit her with the billy club and the counts that were explicitly based on the billy club, the DNA Report was not the clearly exculpatory evidence Zapata believes it to be.  The DNA Report was inconclusive as to the shaft of the billy club.  The prosecution would have stressed this point at trial.  Other aspects of the record also gave the prosecution potential avenues to address the DNA Report at trial, including that:

> (1)  KC's accounts of the assault in the record do not specify whether Zapata held the billy club by the handle or the shaft when he hit her;
>
> (2)  Zapata may have only held the billy club for a relatively brief period of time— KC's accounts of the assault in the record do not indicate how long Zapata held the billy club or how many times he struck her with it.[11];

---

[11]  Zapata contends that KC testified in the grand jury that he beat her for hours with the billy club.  (ECF No. 26.)  The record does not support this claim and even if Zapata were correct, the DNA Report was still not exculpatory on the Strangulation count or clearly exculpatory even with respect to Zapata's alleged use of the billy club.

In an apparent attempt to buttress this claim, Zapata asked Judge Bianco for the transcript of his arraignment.  Judge Bianco granted this request.  According to the arraignment transcript, the prosecutor represented, without further elaboration, that Zapata "broke into [KC's] home and he proceeded to punch and kick her and then hit her with a billy club, breaking her two front teeth and causing her to blood, struck her all over her body, strangled her to the point of unconsciousness."  (ECF No. 28-1.)  While the prosecutor stated that Zapata "struck [KC] all over her body," the prosecutor did not indicate whether these strikes came from punches and kicks or the billy club.  After receiving this transcript, Zapata filed a letter contending that the transcript had been altered.  (ECF No. 29.)  According to Zapata, the prosecutor represented at the arraignment that he "beat the victim for three (3) hours with the Billy Club"—a statement that is not found in the transcript.  (ECF No. 29.)  Based on this and other alleged discrepancies, Zapata has requested production of any audio recordings of the arraignment.  Relatedly, Zapata has also requested that the Court direct Respondent to produce the grand jury minutes.  The Court previously denied these discovery requests and now reaffirms that earlier denial.

For a § 2554 petition:

discovery is only allowed if the district court, acting in its discretion, finds 'good cause' to allow it. This 'good cause' standard is satisfied where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief.

Campbell v. Artus, No. 14-CV-5594, 2019 WL 1434976, at *4 (E.D.N.Y. Mar. 29, 2019) (quoting Beatty v. Greiner, 50 F. App'x 494, 496–497 (2d Cir. 2002)).  The Supreme Court's decision in Cullen v. Pinholster, 563 U.S. 170, 178 (2011), also places additional hurdles on a petitioner's ability to obtain discovery of additional evidence for any claims in a § 2554 petition that a state court has denied on the merits.  See Beltran v. Keyser, No. 15-CV-7201, 2018 WL 1175134, at *3 (E.D.N.Y. Mar. 5, 2018).

Zapata's discovery requests do not satisfy the "good cause" standard.  The Court also notes that it does not appear that the audio recording and grand jury minutes Zapata seeks were ever made part of the record when Zapata litigated his claims concerning the DNA Report in state court.

(3)  KC owned the billy club and had surely handled it prior to this incident; and

(4)  KC appears, according to her own account, to have handled the billy club at one or more points during the July 3 incident and may have done so after Zapata used the billy club.  For example, KC informed Probation that she "tried to fight back and was going to hit [Zapata] with the billy club when she had access to it," but believed that if she missed "he would kill her."  (PIR at 12.).

To the extent Zapata asserts that, if he had only known about the DNA Report, he would have proceeded to trial on all the counts in the indictment, that factual claim is simply not credible.

Zapata's repeated (and mistaken) insistence that he would have obtained outright dismissal of the entire indictment based on the DNA Report undermines his claim that he actually would have proceeded to trial.  Even with the DNA Report, Zapata would have still had to go to trial on all the counts in the indictment, including the felony Strangulation charge.

Zapata's claim that he would have proceeded to trial is also not credible given the damning evidence arrayed against him, particularly on the Strangulation count.  There was overwhelming evidence in the record to support KC's account that he strangled her.  KC told Detective Grathwohl that Zapata had choked her and two officers observed bruising on her neck.  While Zapata claimed, at sentencing, that KC did not have any "black and blues to prove strangulation," he has not pointed to any evidence to support that claim.  Additionally, photographs were apparently taken of KC that night, and Zapata has never asserted that these photographs support his conclusory claim that she had no bruises.  Moreover, while Zapata told officers that he did not strike KC with the billy club, he admitted that the fight continued after he threw the phone at her, which is consistent with KC's claim that she was strangled.

While Zapata contends that he would have gone to trial, it would have been extremely difficult for Zapata to mount a defense to the charges against him—particularly the Strangulation count—without taking the stand and recounting his version of events.  However, taking the stand

would have been extremely risky. Judge Mazzei already ruled that the jury would learn that Zapata had prior felony convictions if he took the stand. Judge Mazzei had also ruled that if Zapata took the stand, the prosecution could introduce a letter in which he stated he did not remember what had happened.

Even if Zapata had taken the stand, his contrary version of events would have been refuted by the prosecution's evidence, including the presence of the ladder outside KC's bedroom window, which contradicted Zapata's entire narrative that KC attacked him when he was sleeping inside the house. Additionally, while Zapata has claimed that text messages and a phone call would have corroborated his version of events, Zapata has never provided any such supporting evidence.

Moreover, Zapata has admitted, on numerous occasions—including to Probation and at sentencing—that he choked KC. There was little chance that, if Zapata took the stand, the jury would credit his claim that he only briefed choked KC and that this choking did not rise to the level of Strangulation in the Second Degree.

Furthermore, given all the charges, Zapata—whose plea agreement included a three-year sentencing recommendation by the prosecution provided that he cooperated with Probation— risked a lengthy prison sentence if he went to trial. Based on the Attempted Murder count alone, which was a Class B felony, Zapata, as a prior felony offender, faced a sentence of 8 to 25 years. N.Y. Penal Law § 70.02(3)(a); see Mem. in Opp. to Coram Nobis Petition at 5, ECF No. 157–65.) Other counts, which did not appear to have even involved the billy club, also carried lengthy potential sentences. The Strangulation count, which Zapata ultimately pled to, carried a maximum term of seven years imprisonment. See N.Y. Penal Law § 70.02(3)(c); Aff. in Opp. to Coram Nobis Petition ¶ 14, ECF No. 12 at 153.) Even on Count Six, the False Imprisonment Charge, which was only an "E Felony," Zapata faced a potential sentence of up to four years. N.Y. Penal

Law § 70.00.

It is also notable that at one point during the sentencing hearing, Zapata indicated his apparent willingness to plead guilty to certain charges and desire for a better plea deal. Those statements further undercut his claim that he would have proceeded to trial.

Zapata's brief on his direct appeal also contains an admission which further undermines his claim that, if he had only known about the DNA Report, he would have proceeded to trial. Specifically, Zapata's brief admits that he "asked to withdraw his plea before sentencing because he learned that this particular judge, who is new to the bench, had quickly earned a reputation for disregarding the prosecutor's sentencing recommendations and negotiated plea bargains" and Zapata "did not know this at the moment of the plea." (Appellant's Br. at 14.) This admission shows that Zapata had other motivations for seeking to withdraw his plea and undermines his claim that his ignorance of the DNA Report is what led to him to plead guilty.[12]

These facts are relevant to each of the claims addressed below.

### 3. Zapata's Claims that a Hearing on his Motion to Withdraw his Plea Was Required and that the Motion to Withdraw Should Have Been Granted

Zapata claims that Judge Mazzei erred when he "failed to conduct a hearing on [his] request to withdraw his plea" because Stafford "withheld exculpatory" DNA evidence until after Zapata pled guilty. (Pet., ECF No. 1 at 5.) Zapata asserts that if he had known about the DNA evidence, he would not have pled guilty.

The Court also liberally construes the Petition to allege that Zapata's motion to withdraw should have been granted.

---

[12] None of Zapata's subsequent papers disavow this statement in his appellate brief. Notably, after reviewing the brief drafted by appellate counsel, Zapata sent a letter to appellate counsel stating that he was "very happy" with the brief. (See Letters from Zapata to Atwell, ECF No. 12 at 139–144.) While Zapata also told appellate counsel he wanted additional arguments to be included in the brief (and now claims appellate counsel was ineffective for not raising those additional arguments), Zapata has never asserted that the admission set out above was inaccurate. (Id.)

There are reasonable arguments that these claims were not exhausted and, at this point, should be deemed exhausted, but procedurally barred. However, even assuming that Zapata has exhausted his claims concerning the motion to withdraw or could overcome a procedural default, these claims are substantively meritless.

Zapata's claim that Judge Mazzei should have held a hearing on the motion to withdraw fails because there is no right to an evidentiary hearing for withdrawal of a guilty plea. See Hines v. Miller, 318 F.3d 157, 162 (2d Cir. 2003) ("Both federal and state precedent have established that a defendant is not entitled as a matter of right to an evidentiary hearing on a motion to withdraw a guilty plea.") "The failure to hold an evidentiary hearing on a motion to withdraw a plea does not offend a deeply rooted or 'fundamental' principle of justice," and, thus, does not provide a basis for habeas relief. Id.; see Reed v. Brown, No. 10-CV-3072, 2012 WL 34092, at *5–7 (S.D.N.Y. Jan. 6, 2012) (explaining that this principle articulated in Hines is "now settled law in this Circuit"); see also Trimm v. Kirkpatrick, No. 18-CV-287, 2021 WL 981814, at *13–14 (N.D.N.Y. Mar. 16, 2021).

Moreover, given the record before him and the content of Zapata's statements at sentencing, Judge Mazzei had ample grounds to deny the motion to withdraw without a hearing.

Zapata's Petition asserts that his motion to withdraw should have been granted because his ignorance of the DNA Report at the time of the plea—which was a result of alleged ineffective assistance of trial counsel—rendered his plea invalid. As explained in the next section, the ineffective assistance claim underlying that argument is meritless. Moreover, to the extent Zapata asserts—separate from his ineffective assistance claim—that his ignorance of the DNA Report establishes that his plea was not knowing, voluntary, and intelligent, that claim also fails.

When considering the validity of a guilty plea, courts consider "whether the plea represents

29

a voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25, 31 (1970). "A plea is considered 'intelligent if the accused had the advice of counsel and understood the consequences of his plea, even if only in a fairly rudimentary way,' and it is considered 'voluntary if it is not the product of actual or threatened physical harm, mental coercion overbearing the defendant's will, or the defendant's sheer inability to weigh his options rationally.'" Manzullo v. People of New York, No. 07-CV-744, 2010 WL 1292302, at *5 (E.D.N.Y. Mar. 29, 2010) (quoting Miller v. Angliker, 848 F.2d 1312, 1320 (2d Cir. 1988)). Therefore, a "plea of guilty entered by one fully aware of the direct consequences of the plea is voluntary in a constitutional sense unless induced by threats, mis-representation, or perhaps by promises that are by their nature improper." Bousley v. United States, 523 U.S. 614, 619 (1998) (internal alteration and citations omitted).

The fact that Zapata did not learn about the DNA Report until after he pled guilty does not establish that his plea was not knowing, voluntary, and intelligent.

In the related context of Brady claims, the Supreme Court held in United States v. Ruiz, 538 U.S. 622, 630 (2002), that prosecutors are not obligated to disclose impeachment evidence prior to a defendant's guilty plea. Notably, in Ruiz, the Supreme Court rejected the Ninth's Circuit's reasoning that a prosecutor's failure to disclose impeachment evidence rendered the defendant's guilty plea "not 'voluntary.'" Id. at 629. Following Ruiz, courts, including the Second Circuit, have held that, under deferential AEDPA review, it is not unreasonable for a state court to also conclude that the Constitution does not obligate prosecutors to disclose exculpatory evidence prior to a guilty plea. See Friedman v. Rehal, 618 F.3d 142, 154 (2d Cir. 2010); Carrasquillo v. Heath, No. 10-CV-5639, 2017 WL 4326491, at *7 (E.D.N.Y. Sept. 28, 2017) ("[T]here is no clearly established federal law requiring the production of potentially exculpatory or impeachment

evidence prior to a defendant's guilty plea . . . ."). These <u>Brady</u> cases have relevance here where—although the prosecutor disclosed the DNA Report—Zapata suggests that his guilty plea was not "knowing and voluntary" because he was not personally aware of the DNA Report at the time of the plea.  Given this precedent, the state court's denial of Zapata's motion to the withdraw (and refusal to hold a hearing) was neither contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  Moreover, as explained earlier, the DNA Report was not exculpatory as to the Strangulation count.  With respect to the Strangulation count, the DNA Report was akin to potential impeachment evidence—a further reason why the state court decisions here were neither contrary to, or an unreasonable application of clearly established Supreme Court precedent.

### 4. Ineffective Assistance of Counsel Claims Concerning the DNA Report and Motion to Withdraw

Zapata's second ground for habeas relief asserts that he "was denied his right to have Effective Assistance of Counsel."  (Pet., ECF No. 1 at 7.)  Zapata appears to assert that his trial counsel was ineffective for failing to provide him with the DNA Report and, relatedly, for not moving to withdraw his plea based on Zapata's ignorance of the DNA Report at the time of his plea.

*i. These Ineffective Assistance Claims are Procedurally Barred*

Zapata never exhausted his claim that trial counsel provided ineffective assistance concerning the DNA Report.  That claim, however, is now procedurally barred and Zapata cannot establish either cause and prejudice or actual innocence to overcome this procedural bar.

As explained below, Zapata did not exhaust this ineffective assistance claim through his direct appeal or through his second § 440.10 motion.  While Zapata could potentially establish cause to overcome this procedural bar by showing that appellate counsel was ineffective for not

raising this claim on direct appeal, his claim that appellate counsel was ineffective fails on the merits.

Zapata never raised an ineffective assistance claim on direct appeal. While Zapata argued on direct appeal that the trial court should have granted his motion to withdraw, Zapata's brief only mentioned the DNA evidence in passing and never framed this as an ineffective of counsel claim. Accordingly, Zapata did not exhaust an ineffective assistance of counsel claim on direct appeal.

Zapata did squarely raise a claim that trial counsel was ineffective in his second 440.10 motion. Specifically, Zapata asserted in his second 440.10 motion that Stafford was ineffective for not telling him about the DNA Report before the guilty plea and for not pursuing motions to dismiss the indictment and suppress evidence based on the DNA Report.

That ineffective assistance claim, however, was not exhausted and is now procedurally barred. Zapata never appealed Judge Mazzei's denial of his second 440.10 motion and the time for appealing that decision has long since elapsed. See C.P.L. § 460.10(4)(a) (providing 30 days to seek leave to appeal); Collazo v. Lee, No. 11-CV-1804, 2011 WL 6026301, at *3 (E.D.N.Y. Dec. 2, 2011) ("Under New York law, a defendant has thirty days to appeal a denial of a § 440 motion") (citing C.P.L. § 460.10(4)(a)). Accordingly, Zapata did not exhaust this claim. See Pesina v. Johnson, 913 F.2d 53, 54 (2d Cir. 1990) ("We have held that the exhaustion requirement mandates that federal claims be presented to the highest court of the pertinent state before a federal court may consider the petition. Pesina, by failing to appeal the denial of his Section 440.10 motion, has not fulfilled this requirement."). However, because state appellate review of this claim is no longer available to Zapata, this claim is deemed exhausted, but procedurally barred. See Collazo, 2011 WL 6026301, at *3 (finding claim to be "exhausted, but . . . deemed procedurally

32

barred from federal habeas review" where petition failed to seek leave to appeal the denial of his § 440 motion).

Liberally construed, Zapata's papers assert that he can establish cause for this procedural default because, shortly after Judge Mazzei denied his second § 440.10 motion, Zapata's legal papers concerning this motion were thrown out or lost when he was transferred to a different facility. This argument, however, fails because once Zapata obtained copies of the missing papers by early March 2019—less than two months after the deadline for him to appeal—he could have sought permission, from the Appellate Division, to file a late application for leave to appeal. See Harrison v. Griffin, No. 14-CV-6437, 2015 WL 5178712, at *1 (E.D.N.Y. Sept. 3, 2015) (indicating that after petitioner's 440.10 motion was denied, he requested and was granted permission to file a late application for leave to appeal the denial of the § 440.10 motion). Zapata, however, never filed a late application for leave to appeal after he obtained copies of his missing legal papers shortly after the appeal deadline. Accordingly, the Court finds that Zapata has not established cause to excuse his procedural default. See Blount v. Johnson, No. 06-CV-132, 2006 WL 2076771, at *6 (E.D. Va. July 24, 2006), (finding that petitioner failed to establish cause based on prison officials' alleged withholding of his legal papers because "[e]ven assuming 'some interference by officials,' petitioner could have filed his appeal through reasonable diligence," including filing a "motion for an extension of time" for his appeal in state court).

Given that years have now passed without Zapata ever attempting to file such an application, this Court can safely conclude that Zapata is, at the present time, precluded from appealing the denial of his second § 440.10 motion. The ineffective assistance claim asserted therein has, thus, been procedurally defaulted and Zapata has not established cause (or actual innocence) to excuse his procedural default.

In his coram nobis petition, Zapata argued that appellate counsel was ineffective for not raising, on direct appeal, a claim that trial counsel was ineffective for failing to tell Zapata about the DNA Report. Zapata did exhaust this claim that appellate counsel was ineffective. Accordingly, Zapata could have raised this ineffective assistance of appellate counsel in his § 2254 petition.[13] Zapata could also seek to rely on this alleged ineffective assistance of appellate counsel to establish cause for purposing of overcoming the procedural default of his ineffective assistance of trial counsel claim.

Whether brought as an independent claim or as a ground to overcome Zapata's procedural default of his ineffective assistance of trial counsel claim, Zapata's claim that appellate counsel was ineffective fails.

"An appellate lawyer's performance falls below professional standards when she fails to raise a significant, obvious issue, 'while pursuing issues that [are] clearly and significantly weaker.'" Lynch v. Dolce, 789 F.3d 303, 312 (2d Cir. 2015) (quoting Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994)).

Here, appellate counsel concluded that an ineffective assistance of trial counsel claim would be frivolous and instead decided to pursue alternative arguments, including advancing a claim that Zapata's sentence was excessive and challenging the denial of the motion to withdraw on the basis that Judge Mazzei engaged in an irregular practice of disregarding bargained-for sentences. Appellate counsel's decision not to pursue an ineffective assistance claim and to instead pursue other arguments was reasonable. As explained further below, Zapata's ineffective assistance claims concerning trial counsel fail on the merits. Additionally, appellate counsel had

---

[13] Zapata's § 2254 petition does not appear to raise this claim of ineffective assistance of appellate counsel as a ground for relief. However, even assuming that his petition should be liberally construed to include this claim, as explained below, this claim fails on the merits. Moreover, the Appellate Division's denial of Zapata's coram nobis petition was certainly not contrary to, or an unreasonable application of, clearly established Supreme Court

further reasons to conclude that such a claim would not succeed if raised on direct appeal.  The record at sentencing and on appeal did not include the DNA Report or any signed affidavit or sworn testimony from Zapata.  Appellate counsel could have reasonably concluded that, given the record, asserting an ineffective assistance of trial counsel claim on direct appeal would not have been successful.  See People v. Fisher, 121 A.D.3d 1013, 1014, 995 N.Y.S.2d 168, 169 (N.Y. App. Div. 2d Dep't 2014) ("Insofar as the defendant contends that his counsel's conduct affected the voluntariness of the plea, the contention is based on matter dehors the record and, thus, cannot be reviewed on direct appeal.  The appropriate vehicle to allege ineffective assistance of counsel based on matter dehors the record is pursuant to CPL 440.10") (cleaned up).  For similar reasons, there is also not a reasonable probability that, on direct appeal, the Appellate Division would have vacated Zapata's conviction based on alleged ineffective assistance of trial counsel.  Because appellate counsel was not ineffective, Zapata cannot rely on this claim to establish cause to overcome his procedural default.

In any event, as explained below, Zapata's ineffective assistance claims are all meritless.

### ii. The Ineffective Assistance Claims Fail on the Merits

Generally, to prevail on an ineffective assistance of counsel claim, a defendant must show that: (1) "counsels' representation fell below an objective standard of reasonableness"; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694 (1984).  This standard also generally applies to ineffective assistance claims involving of counsel during guilty pleas and plea negotiations.  Lafler v. Cooper, 566 U.S. 156, 162–64 (2012).  Zapata cannot establish either prong of the Strickland test.

First, counsel's representation did not fall below an objective standard of reasonableness.

Zapata claims that Stafford acted unreasonably by not telling him about the DNA Report before he pled guilty. However, given all the circumstances here—including the fact that the DNA Report was not exculpatory as to the Strangulation count and would have, at best, provided some evidence to attack KC's account of the altercation at trial—Stafford's failure to explicitly discuss the DNA Report with Zapata prior to his guilty plea was not unreasonable. Zapata's claim is further weakened by the fact that Zapata has not identified what he and Stafford discussed about his case prior to the guilty plea, including what advice Stafford provided him connection with his guilty plea. Moreover, Stafford himself was, according to Zapata's own account, clearly aware of the DNA Report on May 31 and surely weighed the DNA Report in negotiating Zapata's plea and advising him about that plea.

Given the points above, Zapata's claim fails on the first prong of Strickland.

Second, Zapata's ineffective assistance claim fails on the prejudice prong. Generally, to establish prejudice under Strickland in the context of a guilty plea, a defendant must first prove that but-for the ineffective assistance of counsel, there is a "reasonable probability" that he would have pled not guilty. Hill v. Lockhart, 474 U.S. 52, 59 (1985). A defendant must establish that the decision to plead not guilty "would have been rational under the circumstances." Padilla v. Kentucky, 559 U.S. 356, 372 (2010). "[C]ourts have recognized that a petitioner must provide some basis for concluding that the chance of acquittal or conviction of lesser charges was sufficiently high that the petitioner would have rationally chosen to take the risk of conviction and a longer sentence that accompanies a trial rather than accept the certainty of conviction and a generally lesser sentence that is entailed by a guilty plea." Cuevas v. United States, No. 10-CV 5959, 2012 WL 3525425, at *9 (S.D.N.Y. Aug. 16, 2012), report and recommendation adopted, 2013 WL 655082 (S.D.N.Y. Feb. 22, 2013).

As explained earlier, Zapata's assertion that he would have gone to trial if he had known about the DNA Report is, given all the evidence in the record, simply not credible. Given all the circumstances here, there is not a reasonable probability that, if Zapata had been told about the DNA Report and been given appropriate advice concerning its relevance to the charges before the plea, that he would have not pled guilty and instead proceeded to trial.

For similar reasons, Zapata's related claim that Stafford was ineffective for not moving to withdraw his plea on the ground that Stafford failed to tell him about the DNA Report also fails. "[A] motion to withdraw a plea rests within the sound discretion of the court, and generally the court's determination will not be disturbed absent an improvident exercise of its discretion." People v. Casiano, 210 A.D.3d 692, 692, 177 N.Y.S.3d 686 (N.Y. App. Div. 2d Dep't 2022). This claim fails on the first prong strong of Strickland because such a motion to withdraw was meritless. Moreover, even if defense counsel had asserted this ground for withdrawal of the plea and introduced more evidence into the record to support this claim—including the DNA Report itself, the accompanying fax transmission receipt, and supporting affidavits from Zapata and Stafford— there is not a reasonable probability that Judge Mazzei would have exercised that discretion in Zapata's favor. The DNA Report was not exculpatory as to the Strangulation count, the evidence against Zapata on that count was overwhelming, and he had even admitted to probation (as well as at sentencing) that he choked KC. (See PIR at 12 ("It was a brief obstruction.").)

Both these claims are meritless. Moreover, to the extent that they were properly exhausted, the state court decisions rejecting these claims were not contrary to, or based on an unreasonable application of, clearly established Supreme Court precedent.

Finally, the Court notes that Zapata could potentially argue that his claim alleging that Stafford was ineffective concerning the motion to withdraw the plea involved a conflict of interest

and should therefore be analyzed under Cuyler v. Sullivan, 446 U.S. 335, 348-49 (1980), rather than the generally applicable Strickland standard.

An actual conflict of interest arises when, during the course of the representation, the attorney's and defendant's interests "diverge with respect to a material factual or legal issue or to a course of action." Cuyler v. Sullivan, 446 U.S. at 356 n. 3.

Where an actual conflict of interest has been established, the defendant must show that the attorney's performance was adversely affected by demonstrating that:

> some "plausible alternative defense strategy or tactic might have been pursued," and that the "alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." [United States v. Levy, 25 F.3d 146, 157 (2d Cir. 1995) (quotation omitted)]; accord [Lopez v. Scully, 58 F.3d 38, 41 (2d Cir. 1995)]. Notably, the term "plausible alternative defense strategy" does not encompass "all possible courses of action open to a defense attorney [.]" Lopez, 58 F.3d at 41. Rather, it refers to those which a "zealous advocate" would "reasonably pursue" under the circumstances. Id.

Viscomi v. Conway, 438 F. Supp. 2d 163, 171 (W.D.N.Y. 2006). "Once a petitioner has shown that an actual conflict of interest adversely affected defense counsel's performance, prejudice to the petitioner is presumed." Lopez, 58 F.3d at 43.

This standard may apply where a defendant asserts a pro se motion to withdraw his plea at sentencing and alleges that his current counsel provided ineffective assistance in connection with the plea. See Hines, 318 F.3d 157; Viscomi, 438 F. Supp. 2d 163; see also United States v. Rivernider, 828 F.3d 91, 107 (2d Cir. 2016) ("[The Second Circuit] has generally utilized an ineffective-assistance-of-counsel analysis based on Strickland and/or Cuyler in such cases."); Redd v. Woughter, No. 09-CIV-9819, 2012 WL 2864514, at *7–8 (S.D.N.Y. July 12, 2012) ("[T]he Second Circuit's analysis [in Hines] equally applies where, as here, defense counsel's conflict of interest as to his client's motion for plea withdrawal manifests itself in affirmative, rather than implied, opposition to that motion.").

38

However, any such claim by Zapata is both procedurally barred and substantively meritless.[14]

To prevail on this claim, Zapata would have to establish that his allegations "had sufficient merit to create an actual conflict of interest" and that a motion to withdraw based on Stafford's alleged ineffective assistance in not telling Zapata about the DNA Report would have presented a "'plausible alternative defense strategy.'" Hines, 318 F.3d at 163. Stafford, however, did not act unreasonably by not explicitly discussing the DNA Report with Zapata prior to his guilty plea on the Strangulation count. Zapata's allegations did not give rise to an actual conflict. For similar reasons, a motion to withdraw would have been meritless. Ultimately, given all the circumstances explained in depth above, a motion to withdraw—even one that included the DNA Report itself and a concession by Stafford that he did not discuss the DNA Report with Zapata before the guilty plea—was simply not a "plausible alternative defense strategy."[15] Accordingly, even under the Cuyler standard, this claim fails.

---

[14] It is not clear that Zapata exhausted any such claim. In Zapata's October 15, 2018 "Response" to Respondent's opposition to his Petition, Zapata cited two cases that considered such a claim, Hines, 318 F.3d 157, and Viscomi, 438 F. Supp. 2d 163. However, none of his state court filings alleging ineffective assistance of counsel cite these two cases or assert that, because of an alleged conflict, the Cuyler standard—rather than the general "reasonable probability" standard—should govern his claim. Rather, his state court filings (including his coram nobis petition) repeatedly rely on the "reasonable probability" standard and focus on Stafford's failure to disclose the DNA Report prior to the plea rather than on Stafford's alleged ineffectiveness in connection with the subsequent motion to withdraw the plea. Moreover, with a single exception, none of his state court filings even assert that Stafford labored under a conflict of interest. The only exception is Zapata's second § 440.10 motion which asserted that: (1) at sentencing, Stafford attempted to cover up his failure to disclose the DNA Report; and (2) Zapata's statements at sentencing put Stafford in "a situation that [was] adverse to the defendant['s] interests." (Second § 440.10 Motion, ECF No. 18-1 at 8.) These passing statements might be sufficient to raise a conflict-of-interest claim concerning the motion to withdraw for purposes of exhaustion. However, even if this claim was sufficiently raised, for purposes of exhaustion, in Zapata's second § 440.10 motion, this claim must be deemed exhausted, but procedurally barred because Zapata failed to appeal the denial of that motion. And, as explained previously, he has not established cause to overcome that procedural default.

[15] As noted earlier, after his plea, Zapata made admissions to Probation, at sentencing, and in his appellate brief that undermine his ineffective assistance claims. Even if the Court were to ignore those statements, a motion to withdraw—based on all the other evidence in the record that was known to Stafford at the time of the plea—was not a plausible motion.

This claim is meritless.  Additionally, to the extent that this claim was properly exhausted, this claim must be denied because the state court decisions rejecting Zapata's ineffective assistance claims were not contrary to, or based on an unreasonable application of, clearly established Supreme Court precedent.[16]

## C.  <u>Ground Three – Excessive Sentence Claim</u>

Zapata has exhausted a claim that his sentence was excessive or otherwise illegal, as he raised it on direct appeal to the Appellate Division and also sought leave to appeal to the Court of Appeals.  (Appellant's Brief, ECF No. 12 at 55; Application for Leave to Appeal, ECF No. 12 at 97.)  This claim, however, is meritless.

Generally, habeas petitions that raise excessive sentencing claims under the Eighth Amendment fail whenever the sentence imposed "is within the range prescribed by state law." <u>White v. Keane</u>, 969 F.2d 1381, 1383 (2d Cir. 1992); <u>see also</u> <u>Dantzler v. Superintendent, Sing Sing Corr. Facility</u>, No. 09-CV-1513, 2009 WL 3055297, at *5 (E.D.N.Y. Sept. 22, 2009).  Here, Zapata's determinate prison sentence of five years (along with five years of supervised release) falls within the range permitted by statute.  Strangulation in the Second Degree is a violent class D felony with a maximum determinate sentence of seven years.  N.Y. Penal Law § 70.02(3)(c); As Zapata's sentence was within the statutory sentencing range, his excessive sentencing claim has no merit.

Additionally, Zapata's sentence is not "one of the 'exceedingly rare' sentences that violates the Eighth Amendment by being 'grossly disproportionate' to his crime." <u>Dantzler</u>, 2009 WL 3055297, at *5 (citing <u>Ewing v. California</u>, 538 U.S. 11, 30–31 (2003)).

---

[16]  In <u>Hines</u>, 318 F.3d 157, the Second Circuit—in concluding that the Appellate Division's decision before it did not constitute "an unreasonable application of clearly established Federal law as determined by the Supreme Court"—stressed "the many divergent approaches and outcomes in federal courts" in addressing this type of ineffective assistance claim.  <u>Hines</u>, 318 F.3d at 164.

Finally, given Judge Mazzei's repeated statements, during the plea colloquy, that Zapata might ultimately receive more than a three-year prison sentence, any suggestions that Zapata's five-year sentence violated due process or the Eighth Amendment are meritless.

## D. **Ground Four:  Speedy Trial Claim**

Zapata's final claim states that he "has the right under law for a speedy trial" and "never waived his speedy trial rights."

This claim is unexhausted and procedurally barred.  It is also substantively meritless.

At no point in Zapata's direct appeal, nor in any of the collateral attacks on his conviction, was any mention made of his right to a speedy trial.  See Allison v. Khahaifa, No. 10-CV-3453, 2011 WL 3298876, at *7 (E.D.N.Y. Aug. 1, 2011) (finding the petitioner's speedy trial claim unexhausted where "petitioner never raised a Sixth Amendment speedy trial claim at his trial, on appeal to the Appellate Division, or in his letters to the New York Court of Appeals.")

However, this claim is deemed exhausted, but procedurally barred because this is a record-based claim that Zapata had to pursue on direct appeal pursuant to N.Y. C.P.L. § 440.10(2)(c). See Allison, 2011 WL 3298876, at *7–8; Nelson v. New York, No. 10-CV-9021, 2014 WL 4449774, at *20 (S.D.N.Y. Sept. 10, 2014).  Zapata cannot overcome this procedural bar.  While Zapata's petition appears to fault his appellate counsel for not pursuing speedy trial claims on direct appeal, this argument cannot establish "cause" because Zapata never asserted a claim in state court that appellate counsel was ineffective on this ground.  Moreover, failure to consider this claim will not result in a miscarriage of justice.

In any event, Zapata's claim is meritless. The Court liberally construes this claim to allege a violation of Zapata's speedy trial rights under Sixth Amendment.  The Supreme Court has identified four relevant factors for determining if a defendant's speedy trial rights under the Sixth

Amendment have been violated:  the length of delay; reason for the delay; prejudice experienced by a defendant; and defendant's assertion of his rights.  Barker v. Wingo, 407 U.S. 514, 530–32 (1972).  Here, Zapata was arrested on July 3, 2015 and pled guilty on May 31, 2016 in the midst of jury selection.  Prior to trial, Judge Mazzei had to address pretrial motions and hold a suppression hearing.  The record does not indicate that Zapata ever asserted his speedy trial rights.[17]  Nor does the record indicate that Zapata suffered any prejudice from the eleventh-month delay from his arrest until his trial.  Considering the entire record here and all the relevant factors, Zapata's speedy trial rights under the Sixth Amendment were not violated here.  See Hodges v. Bezic, 09–CV–3402, 2012 WL 607659, at *5 (E.D.N.Y. Feb. 24, 2012)

Therefore, Zapata's speedy trial claim is denied as both procedurally barred and clearly meritless.

### III.  CONCLUSION

For the reasons set out above, Zapata's petition is **DENIED** in its entirety.  A certificate of appealability shall not issue because Zapata has not made a substantial showing that he was denied any constitutional rights.  See 28 U.S.C. § 2253(c)(2).  I certify that any appeal of this Order would not be taken in good faith, and thus in forma pauperis status is denied for the purposes of any appeal.  Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

---

[17]  Zapata contends that, at his arraignment, Stafford asserted Zapata's speedy trials rights by allegedly referencing Zapata's "30/30 rights".  (See ECF No. 29.)  The transcript of the arraignment, however, does not indicate that Stafford made any such statement and Zapata's assertions to the contrary are not credible.  (ECF No. 28-1.)  Moreover, even assuming for the sake of argument that Stafford did assert Zapata's speedy trial rights, the Court would still conclude that Zapata's speedy trial rights under the Sixth Amendment were ultimately not violated here.

42

The Clerk of the Court is respectfully directed to mail a copy of this Order to Zapata and

to close this case.

**SO ORDERED.**

Dated:  June 28, 2024
Central Islip, New York


                                        _____/s/  (JMA)_____
                                        JOAN M. AZRACK
                                        UNITED STATES DISTRICT JUDGE